```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:   9/22/2020
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**Douglas Campbell,**

                              **Plaintiff,**

              **-against-**

**Commissioner of Social Security,**

                              **Defendant.**

**1:19-cv-03215 (SDA)**

**OPINION AND ORDER**

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE:**

Plaintiff Douglas Campbell ("Campbell" or "Plaintiff") brings this action pursuant to § 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security, denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Compl., ECF No. 2.) Presently before the Court are the parties' cross-motions, pursuant to Fed. R. Civ. P. 12(c), for judgment on the pleadings. (Comm'r Not. of Mot., ECF No. 12; Pl.'s Not. of Mot., ECF No. 24.)

For the reasons set forth below, the Commissioner's motion is GRANTED and Plaintiff's cross-motion is DENIED.

**BACKGROUND**

**I.    Procedural Background**

In December 2014, Campbell filed applications for DIB and SSI, alleging a disability onset date of July 1, 2014.[1] (Administrative R. ("R."), ECF No. 11, at 85-86, 92-93.) On January 23, 2015,

---

[1] To qualify for DIB, a claimant must be both disabled and insured for benefits. 42 U.S.C. § 423(a)(1)(A) & (E); 20 C.F.R. §§ 404.101, 404.120, 404.315(a). The last date a person meets these requirements is commonly referred to as the date last insured ("DLI"). According to his DIB application, Campbell's DLI was June 30, 2018. (R. 85.) However, the ALJ stated that his DLI was September 30, 2018. (R. 16.)

both applications were denied. (R. 85-100.) Thereafter, Campbell requested a hearing, which was held on February 8, 2017 before Administrative Law Judge ("ALJ") Alexander G. Levine. (R. 56-79.) ALJ Levine issued a fully favorable decision on July 5, 2017, finding that Campbell's severe mental impairments met the criteria of Listing 12.04 (Depressive, Bipolar and Related Disorders) and, therefore, he was disabled (R. 101-11.)

On October 10, 2017, the Appeals Council notified Campbell that it was remanding the case to the ALJ for further proceedings. (R. 112-13.) The Appeals Council determined that the ALJ's decision was in error and not supported by substantial evidence. (R. 114-18.) The Appeals Council found that the ALJ's determination that Campbell met Listing 12.04 was not supported by substantial evidence and that the ALJ erred in his evaluation of Campbell's substance abuse disorder. (*Id*.) Following remand, a second hearing before ALJ Levine was held on January 17, 2018. (R. 33-55.) ALJ Levine denied Campbell's applications on August 30, 2018. (R. 11-32.) ALJ Levine's decision became the Commissioner's final decision when the Appeals Council denied Campbell's request for review on March 19, 2019. (R. 1-5.) This action followed.

## II.    <u>Non-Medical Evidence</u>

Born on June 12, 1967, Campbell was 47 years old on the alleged onset date and 50 years old at the time of the 2018 hearing. (*See* R. 85.) Campbell has a high school education and past relevant work as a certified nurse assistant, shipping assistant, truck loader and laborer. (R. 25, 40-41, 316-17.) Campbell lived by himself in supportive housing under the auspices of the Mental Health Association of New York City, Inc. (*See* R. 39, 506.)

III.   **Relevant Medical Evidence**

A.   **Martin Luther King Wellness Center**

Between November 2013 and at least February 2018, Campbell saw Dr. Scott Schwartz at the MLK Wellness Center for mental health treatment. (R. 482-511, 590-609, 642-66.)

Following the alleged onset date, on August 6, 2014, Campbell saw Dr. Schwartz for a follow-up appointment and medication renewal. (R. 486, 607.) Dr. Schwartz noted that Campbell had been working loading trucks and ran out of his medications and also noted that he drank to control his anxiety. (R. 607.) Dr. Schwartz discussed ways that Campbell could reduce his medications in a reasonable way instead of stopping them abruptly, and Campbell expressed enthusiasm about skipping his medications one day per week. (*Id*.)

During a follow-up visit on November 5, 2014, Dr. Schwartz noted that three months earlier Campbell was depressed, got drunk, cut himself and was admitted and released, but was "fine now" and had "no depressive symptoms at all." (R. 485, 496, 604.) They discussed Campbell's depressive symptoms and need to stay on top of them in order not to get overwhelmed. (R. 604.) The same day, Dr. Schwartz completed a wellness plan report for Campbell, similarly stating that Campbell had been feeling depressed due to losing his job and starting drinking and stopped taking his medications, but then "turned it all around" and now abstains. (R. 482-83.) During a December 3, 2014 follow-up visit, Dr. Schwartz noted that Campbell was "doing very well" and had been abstinent and doing well without mood changes. (R. 484, 495, 601.)

On January 5, 2015, Campbell saw Dr. Schwartz for a medication refill. (R. 600.) Dr. Schwartz noted that Campbell was "stable and working and in excellent control of alcohol use."

(*Id*.) One month later, on February 4, 2015 Campbell saw Dr. Schwartz for another visit and to "talk about SSI." (R. 597.) Dr. Schwartz noted that Campbell complained of severe shoulder pain and also noted concerns that he had symptoms due to pain, but had dropped out of treatment. (*Id*.) Dr. Schwartz referred him to pain management. (*Id*.)

On April 22, 2015, Dr. Schwartz wrote a letter recommending Campbell for SSI. (R. 505, 596.) Dr. Schwartz verified that Campbell had been in treatment for bipolar affective disorder since 2006 and that, prior to that, he had a history of alcohol/pain killer use. (*Id*.) Dr. Schwartz wrote that Campbell presented with "anxiety, flight of ideas, some level of inertia, variable sleep patterns, lability of affect and reduced concentration[,]" which were "obstacles to his being able to work in any continuous fashion." (*Id*.) At his next appointment on June 4, 2015, Dr. Schwartz noted that Campbell was abstinent and stable without side effects. (R. 595.)

Campbell's next documented visit with Dr. Schwartz was not until March 3, 2016. (R. 594.) Dr. Schwartz refilled Campbell's medication and changed his antidepressant. (*Id*.) Dr. Schwartz further noted that Campbell was admitted for decompensation due to death of his mother. (*Id*.) On March 31, 2016, Campbell saw Dr. Schwartz for another medication refill. (R. 593.) Dr. Schwartz noted that Campbell had missed two pick-ups at the pharmacy because he was in rehab, but during the appointment, Campbell reported functioning well with no distress. (*Id*.)

During a follow-up appointment on July 11, 2016, Dr. Schwartz noted that Campbell had a long history of alcohol abuse, but was now attending an abstinence group and got a job moving furniture. (R. 592.) Campbell reported no mood alternations or flight of ideas. (*Id*.) Campbell saw Dr. Schwartz again on December 12, 2016. (R. 590-91.) A mental status examination was within

normal limits. (R. 590.) Dr. Schwartz noted that Campbell's psychiatric symptoms had diminished, but he needed to maintain a psychiatric medication regimen for abstinence. (R. 591.)

On June 5, 2017, Dr. Schwartz noted that Campbell was "totally off drinking" and had been volunteering at a senior center and working off the books. (R. 661.) A mental examination was within normal limits. (*Id*.) Dr. Schwartz noted that Campbell's psychiatric symptoms had diminished and stabilized, but that he needed to maintain a psychiatric medication regimen in order to prevent relapses or hypomanic behavior. (R. 662.)

On December 4, 2017, Campbell saw Dr. Schwartz for a medication refill. (R. 645.) Dr. Schwartz noted that Campbell was "doing well" and was "totally abstinent" without any flight of ideas or disconnection. (*Id*.) Dr. Schwartz noted "no substance abuse" and "no anxiety[.]" (*Id*.)

During an appointment on February 14, 2018, Dr. Schwartz noted that Campbell was without alcohol use and in no distress, but needed forms completed. (R. 642.) He further noted that Campbell was relating well and stable on his medications. (*Id*.) The same day, Dr. Schwartz completed a Medical Source Statement for Campbell. (R. 625-27.) Dr. Schwartz noted that Campbell had the following symptoms: hyperactivity, poor frustration tolerance, difficulty controlling his temper and fears and worries about failing in his life. (R. 625.) Dr. Schwartz opined that Campbell had marked limitations in his ability to perform daily activities and maintain social functioning; an extreme limitation in his ability to concentrate, persist and maintain pace; and that Campbell experienced repeated episodes of decompensation. (R. 625-26.)

**B.    Harlem Bay Network**

Between at least May 2015 and November 2016, Campbell participated in the Harlem Bay Network Personalized Recovery Oriented Services ("PROS") program, including individual

5

recovery planning and intensive relapse prevention, with a goal of attaining and maintaining sobriety. (R. 512-87.) Beginning in May 2015, Campbell met weekly with Licensed Mental Health Counselor ("LMHC") Stephanie Robison, an adviser in the PROS program. (*See id*.) In July 2015, LMHC Robison noted that Campbell had been sober for three months and had accepted per-diem work. (R. 580.) Over the next several months, LHMC Robison noted that Campbell continued to work toward his goals of sobriety and employment and that he was working off the books. (*See*, *e.g.*, R. 562, 567, 570.)

In November 2015, LHMC Robison noted that Campbell had experienced a relapse, which made him feel guilty and depressed, and was working to get back on track. (R. 559-60.) Campbell continued to relapse in December 2015 and did not engage in the program because his mother was experiencing health issues and then passed away. (R. 551-57.) Thereafter, Campbell attended detox and enrolled himself in a 28-day rehabilitation program. (R. 550-51.)

Campbell returned to the PROS program on February 26, 2016. (R. 549.) On March 6, 2016, Campbell resumed his weekly sessions with LMHC Robison where he reported staying sober and worked to process his mother's passing and develop coping skills. (R. 522-49.) In September 2016, LHMC Robison completed a 90-day review of Campbell's services (R. 520-21.)

On October 27, 2016, LMHC Robison reported that Campbell continued to stay sober, but presented as "a little low" due to delays in his SSI case. (R. 516-19, 521.) She noted that Campbell was looking for work off the books to supplement his income in the meantime, and had worked a moving job the last few weeks. (R. 519, 521.) Campbell continued to participate in the PROS program daily and make progress towards his goals. (R. 514-19, 521.)

On November 22, 2016, Campbell met with LMHC Robison for his weekly session and to begin the termination process. (R. 513, 515.) Campbell presented as "despondent" as to how he would handle the upcoming holidays without his mother, but reported that he would "be fine" and take it easy. (*Id*.) Campbell expressed his desire to continue working with an adviser in a therapist role. (R. 513.)

C.      **Dr. Fortuno-Ramirez, M.D.—June 9, 2017 Medical Interrogatory Responses**

At the ALJ's request, Dr. Ramon Fortuno-Ramirez completed medical interrogatory responses on June 9, 2017, following review of Campbell's medical records to date. (R. 620-24.) Dr. Fortuno-Ramirez opined that Campbell had alcohol dependence with the last relapse in September 2013, and that the evidence supported a bipolar disorder "type mixed secure" since August 6, 2014. (R. 620.) Dr. Fortuno-Ramirez opined that Campbell had a moderate limitation in understanding, remember or applying information and marked limitations in interacting with others, maintaining concentration, persistence and pace and adapting or managing oneself. (R. 621.) Thus, Dr. Fortuno-Ramirez opined that Campbell met Listing 12.04. (R. 622.)

D.      **Dr. Toula Georgiou, Psy. D. – March 1, 2018 Psychiatric Examination**

On March 1, 2018, Dr. Toula Georgiou completed a consultative psychiatric examination of Campbell. (R. 628-34.) Dr. Georgiou noted Campbell's current functioning as exhibiting manic symptoms and fluctuating between hyper periods and a depressive state. (R. 628.) On mental status evaluation, Dr. Georgiou found that Campbell was cooperative and his manner of relating was fair. (R. 629.) Campbell appeared restless and his mood and affect were anxious, though his thought process was coherent and goal-oriented and his attention and concentration were intact. (*Id*.) Dr. Georgiou found that Campbell's recent and remote memory skills were mildly

impaired, his cognitive functioning was average and his insight and judgment were fair. (R. 629-30.) Dr. Georgiou noted that Campbell was able to perform daily activities such as grooming and cleaning, took public transportation independently and was interested in going back to school. (R. 630.) She further noted that Campbell was attending a program five days a week, four to five hours per day. (*Id*.) Dr. Georgiou concluded that Campbell may have difficulty regulating his emotions, maintain a regular work schedule and working at a consistent pace. (*Id*.)

Dr. Georgiou also completed a Medical Source Statement indicating that Campbell had no limitations in understanding, remembering and carrying out simple instructions or in his ability to make judgments on simple work-related decisions; a moderate limitation in understanding and remembering complex instructions; and marked limitations in carrying out complex instructions and making judgments on complex work-related decision. (R. 632.) Dr. Georgiou also opined that Campbell had moderate limitations in his ability to interact with the public, supervisors and co-workers, as well as in his ability to respond appropriately to usual work situations and to changes in a routine work setting. (R. 633.)

E.      **Dr. Joseph G. Vitolo – May 23, 2018 Medical Expert Opinion**

Following remand by the Appeals Council, medical expert Dr. Joseph Vitolo submitted a memorandum to the SSA. (R. 681-86.) Dr. Vitolo opined that Campbell had moderate limitations in each of the "paragraph B" criteria.[2] (R. 681.) Dr. Vitolo found that Dr. Schwartz's opinion of marked limitations was not supported by his own progress notes. (R. 682.) Dr. Vitolo noted that he was asked to comment on the Medical Interrogatory responses submitted by Dr. Fortuno-

---

[2] The "paragraph B criteria" for Listing 12.04 and Listing 12.06 are: (1) understand, remember or apply information; (2) interact with others; (3) concentrate, persist or maintain pace; and (4) adapt or manage oneself. *See* 20 C.F.R. Pt. 404, Subpt. P App'x 1 §§ 12.04, 12.06.

Ramirez. (*Id*.) Dr. Vitolo explained that he agreed with the Appeals Council's reasoning[3] and stated his opinion that the treatment notes in the record were inconsistent with a finding of marked limitations in the "paragraph B" criteria. (*Id*.) Dr. Vitolo also completed an RFC assessment, in which he opined that Campbell was no more than moderately limited in any category. (R. 683.)

## IV.    **The January 17, 2018 Administrative Hearing**

Campbell appeared, along his with counsel, for a second administrative hearing before ALJ Levine on February 8, 2017. (R. 56-79.) After discussing the Appeals Council's decision, the ALJ noted that he would be sending Campbell for a consultative examination and getting a medical expert. (R. 35.) Campbell testified that he was taking medication for bipolar and had trouble concentrating and focusing, but could watch an hour of television. (R. 42-43.) Campbell said he last drank alcohol the prior year after his mother passed away. (R. 43-44.) He further testified that he had had other incidents drinking even after 2006, despite the notes from Dr. Schwartz that he had been sober since then. (R. 44-47.) Campbell explained that, during those times he used alcohol to self-medicate. (R. 47.) Campbell also testified about his daily activities and explained his depressive symptoms. (R. 48-51.) The ALJ stated that Campbell should consider providing the Appeals Council's decision to Dr. Schwartz to ask him if it was accurate, and that the ALJ also wanted to hear from Dr. Fortuno-Ramirez again.[4] (R. 54.)

---

[3] Referring to the reasoning contained in the Appeals Council's October 10, 2017 Remand Order. (*See* R. 112-18.)

[4] On April 16, 2018, the ALJ sent a request to Dr. Fortuno-Ramirez asking for his analysis of the Appeals Council's decision and for him to compete another set of interrogatories. (R. 668-73.) However, the record does not contain any response from Dr. Fortuno-Ramirez.

**V.**     **ALJ Levine's August 30, 2018 Decision And Appeals Council Review**

Applying the Commissioner's five-step sequential evaluation, *see infra* Legal Standards

Section II, the ALJ found at step one that Campbell had not engaged in substantial gainful activity

since July 1, 2014, the alleged onset date. (R. 18.) At step two, the ALJ determined that Campbell

had the severe impairments of bipolar disorder, anxiety disorder, depressive disorder, and

alcohol dependence in remission since 2016. (R. 18-19.)

At step three, the ALJ found that Campbell did not have an impairment or combination of

impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404,

Subpart P, Appendix 1. (R. 19-20.) The ALJ specifically considered Listing 12.04 (Depressive,

Bipolar and Related Disorders) and Listing 12.06 (Anxiety and Obsessive-Compulsive Disorders).

(*Id*.) Applying the special technique, the ALJ considered the "paragraph B" criteria and

determined that Campbell had moderate limitations in each of the four broad areas of mental

functioning. (*Id*.) The ALJ explained that he adopted the opinion of Dr. Vitolo, which he found

consistent with the evidence of record. (R. 19.) The ALJ also relied on the opinion of consultative

examiner Dr. Georgiou. (R. 19-20.) The ALJ further stated that he considered the "paragraph C"

criteria[5] and found that the evidence failed to establish those criteria. (R. 20.)

The ALJ then assessed Campbell's Residual Functional Capacity ("RFC") and determined

that he was able to perform a full range of work at all exertional levels, but was limited to the

performance of simple, routine tasks with only occasional decision making, occasional changes

in the work setting and occasional interactions with supervisors and coworkers. (R. 21-24.) In

---

[5] The "paragraph C" criteria, which are discussed further in Discussion Section III below, are used to evaluate "serious and persistent mental disorders." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00.

weighing the medical evidence in the record, the ALJ gave "highly significant weight" to Dr. Georgiou's opinion and "greatest weight" to the opinion of Dr. Vitolo. (R. 23-24.)

At step four, the ALJ found that Campbell's ability to perform past relevant work was immaterial and proceeded to step five. (R. 24.) At step five, the ALJ considered Campbell's age, education and job skills, along with his RFC determination, and concluded that there were other jobs existing in significant numbers in the national economy that Campbell could perform, including floor waxer, industrial cleaner and hospital cleaner. (R. 24-25.) Therefore, the ALJ found Campbell was not disabled during the relevant period and denied his claims for benefits. (*Id*.)

Following the ALJ's decision, Campbell sought review from the Appeals Council, which denied his request on March 19, 2019. (R. 1-5.)

## LEGAL STANDARDS

### I.    Standard Of Review

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Servs., Inc. v. Int'l Union*, 47 F.3d 14, 16 (2d Cir. 1995). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence." *Ulloa v. Colvin*, No. 13-CV-04518 (ER), 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) (citing *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). "Even if the Commissioner's decision is supported by substantial evidence,

legal error alone can be enough to overturn the ALJ's decision[.]" *Id.*; *accord Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

Absent legal error, the ALJ's disability determination only may be set aside if it is not supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (vacating and remanding ALJ's decision). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "The substantial evidence standard is 'a very deferential standard of review—even more so than the clearly erroneous standard, and the Commissioner's findings of fact must be upheld unless 'a reasonable factfinder *would have to conclude otherwise*.'" *Banyai v. Berryhill*, No. 17- CV-01366, 2019 WL 1782629, at *1 (2d Cir. Apr. 24, 2019) (summary order) (quoting *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original) (internal quotation marks omitted). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995).

## II.    Determination Of Disability

A person is considered disabled for benefits purposes when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

An individual shall be determined to be under a disability only if [the combined effects of] [her] physical or mental impairment or impairments are of such severity

that [she] is not only unable to do his previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In determining whether an individual is disabled, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . [continuous period of 12 months], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 ["Listings"] . . . and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. . . .

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

"When determining whether a claimant is disabled due to a mental impairment, an ALJ must apply a 'special technique' at the second and third steps of the five-step framework." *Cherry v. Comm'r of Soc. Sec.*, No. 17-CV-07999 (VEC), 2019 WL 1305961, at *11 (S.D.N.Y. Mar. 22, 2019) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)). First, the ALJ must determine if the claimant has a "medically determinable mental impairment." *Id.* If the claimant is found to have such an impairment, the ALJ must "rate the degree of functional limitation," across four broad functional areas: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist or maintain pace; and (4) adapt or manage oneself. 20 C.F.R. §§ 416.920(a), 404.1520a(b)-(c); *see also* 20 C.F.R. Pt. 404, Subpt. P App'x 1 § 12.00E.

After the first three steps (assuming that the claimant's impairments do not meet or medically equal any of the Listings), the Commissioner is required to assess the claimant's RFC "based on all the relevant medical and other evidence in [the claimant's] case record[.]" 20 C.F.R. §§ 404.1520(e), 416.920(e). A claimant's RFC is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 405.1545(a)(1).

The claimant bears the burden of proof as to the first four steps. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999). It is only after the claimant proves that she cannot return to work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given the claimant's RFC, age, education and

past relevant work experience. *Id.* In conducting a disability analysis, the ALJ has an affirmative

duty to "develop the record." *Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015)

(summary order) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)).

### III.   **The Treating Physician Rule**[6]

An ALJ must follow specific procedures "in determining the appropriate weight to assign

a treating physician's opinion." *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019). First, the ALJ

must decide whether a treating physician's opinion is entitled to "controlling weight." *Id.* The ALJ

must give controlling weight to the opinion of a claimant's treating physician as to the nature and

severity of the impairment as long as it "'is well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in

[the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. §

404.1527(c)(2)); *see also Halloran*, 362 F.3d at 32 ("[T]he opinion of the treating physician is not

afforded controlling weight where . . . the treating physician issued opinions that are not

consistent with other substantial evidence in the record, [including] the opinions of other medical

experts.").

If the ALJ decides the treating physician's opinion is not entitled to controlling weight, the

ALJ "must determine how much weight, if any, to give it." *Estrella*, 925 F.3d at 95.  "Even if the

treating physician's opinion is contradicted by other substantial evidence, and so is not

---

[6] On January 18, 2017, the SSA promulgated a final rule that dramatically changes the nature of the
evaluation of medical opinion evidence. *Revisions to Rules Regarding the Evaluation of Medical Opinion
Evidence*, 82 Fed. Reg. 5844, 2017 WL 168819 (Jan. 18, 2017) (codified at 20 C.F.R. §§ 404 & 416). These
new regulations apply only to claims filed with the SSA on or after March 27, 2017. Accordingly, because
Campbell's claims were filed before that date, to the extent that the regulations regarding medical opinion
evidence are cited in this Opinion and Order, the Court is referring to the version of the regulations
effective before March 27, 2017.

controlling, it may still be entitled to significant weight 'because the treating source is inherently more familiar with a claimant's medical condition than are other sources.'" *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013) (summary order) (quoting *Schisler v. Bowen,* 851 F.2d 43, 47 (2d Cir. 1988)). In deciding what weight to assign, the ALJ must "explicitly consider" the following, nonexclusive factors (the "*Burgess* factors"): "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella*, 925 F.3d at 95-96 (citing *Burgess*, 537 F.3d at 129) (additional citations omitted).

At both steps, the ALJ must give "good reasons" for the weight he gives a treating source's medical opinion. *See Halloran*, 362 F.3d at 32 (2d Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)); *see also Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) ("The ALJ was required either to give [the treating physician's] opinions controlling weight or to provide good reasons for discounting them."). "[A]n ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two is a procedural error." *Estrella*, 925 F.3d at 96 (citing *Selian v. Astrue*, 708 F.3d 409, 419-20 (2d Cir. 2013)). However, if "a searching review of the record" assures the Court "that the substance of the treating physician rule was not traversed," the Court should affirm. *Id.* (citing *Halloran*, 362 F.3d at 32.).

## DISCUSSION

Plaintiff argues that remand is required because: (1) the ALJ did not discuss the opinions of Dr. Schwartz or state the weight he assigned to those opinions in his 2018 decision; (2) the ALJ erred in weighing the opinions of the medical experts; and (3) the ALJ failed to adequately

address the "paragraph C" at step three. (Pl.'s Mem., ECF No. 25, at 17-25.) The Court addresses

each of these arguments in turn.

**I.**    **The ALJ's Consideration Of Dr. Schwartz's Opinions**

SSA regulations require an ALJ to evaluate every medical opinion "regardless of its

source," and determine how much weight to give each opinion based on specific factors. 20 C.F.R.

§§ 404.1527(c), 416.927(c). When an opinion is that of a treating source, an ALJ's failure to

explain the weight assigned to the opinion may violate the treating physician rule because the

opinions of treating sources, even when not controlling, are generally entitled to at least some

weight. *See, e.g., Urena v. Berryhill*, No. 18-CV-03645 (JLC), 2019 WL 1748131, at *13 (S.D.N.Y.

Apr. 19, 2019) (citing cases). However, an ALJ's failure to "assign a specific, quantifiable weight"

to a treating physician's opinion "is not dispositive to the question of whether the ALJ complied

with the treating physician rule, especially where [  ] the ALJ's reasoning for discrediting [the

treating physician's] opinion is clear from the decision." *Nocera v. Saul*, No. 18-CV-05080 (JCM),

2019 WL 3282942, at *7 (S.D.N.Y. July 22, 2019) (citing *Rodriguez v. Colvin*, No. 12-CV-03931 (RJS)

(RLE), 2014 WL 5038410, at *6 (S.D.N.Y. Sept. 29, 2014)) (internal quotations marks omitted); *see

also Franco v. Saul*, No. 16-CV-05695 (LMS), 2020 WL 4284157, at *16 (S.D.N.Y. July 27, 2020)

(ALJ's failure to explicitly identify amount of weight to treating physician's opinion harmless when

ALJ thoroughly considered the opinion) (citing cases).

Plaintiff argues that remand is required because the ALJ's 2018 decision "omitted all

references" to Dr. Schwartz's opinions and did not assign them any weight. (Pl.'s Mem. at 17-18.)

Plaintiff further argues that the ALJ's error was not harmless because Dr. Schwartz's opinions

were not duplicative and the regulatory factors indicate that controlling weight should have been assigned to Dr. Schwartz's opinions. (*Id*. at 19.)

Contrary to Plaintiff's argument, the ALJ did not omit all references to Dr. Schwartz's opinions. At step three, the ALJ specifically discussed Dr. Vitolo's finding that, although Dr. Schwartz indicated that Campbell was unable to work due to various symptoms of anxiety, Dr. Schwartz's treatment notes reflected unremarkable mental status examinations and included statements by Campbell that he was doing well with no symptoms and taking advantage of opportunities to make extra money. (R. 19.) The ALJ adopted this opinion as consistent with the evidence of record. (*Id*.) Later, in making an RFC determination, the ALJ reiterated this analysis and explained that he assigned "greatest weight" to Dr. Vitolo's opinion because the treatment notes, particularly of Dr. Schwartz, did not support the opinions of either Dr. Fortuno-Ramirez or Dr. Schwartz himself.[7] (R. 24.) Thus, while the ALJ should have been more explicit in assigning weight to Dr. Schwartz's opinions, the Court finds that the ALJ's reasoning in discounting Dr. Schwartz's opinions is clear from the decision and that "[r]emanding the matter for the ALJ to explicitly assign a low degree of weight" to the opinion "would not change the ALJ's ultimate determination" that Campbell was not disabled. *See Franco*, 2020 WL 4284157, at *16.

In arguing that Dr. Schwartz's opinions should have been accorded controlling weight, Plaintiff asserts that his opinions are supported by his "specific examples of signs and symptoms,

---

[7] Plaintiff also argues that the ALJ should not have discounted Dr. Schwartz's opinions as inconsistent with his treatment records without first seeking clarification. (Pl.'s Mem. at 20 n. 5.) However, where, as here, a contrary opinion exists, an ALJ is "permitted to consider [the treating physician's] treatment notes in weighing the opinions of [the treating physician and the consultative examiner] and . . . to conclude that [the consultative examiner's] opinion was more reliable.'" *Camille v. Colvin*, 652 F. App'x 25, 28 (2d Cir. 2016) (internal citation and quotation marks omitted).

including hyperactivity, poor frustration tolerance, trouble focusing, flight of ideas, difficulty controlling anger and anxiety." (Pl.'s Mem. at 19-20.) However, Plaintiff does not point to any treatment records, other than the opinions themselves, to support his argument that the opinions should have been afforded controlling weight. (*See* R. 114-15, 117; Pl.'s Mem. at 19-20.) In fact, Dr. Schwartz's most recent treatment notes showed mental status examinations within normal limits and that Campbell's psychological symptoms had stabilized with no anxiety or substance abuse. (R. 642, 645, 661.)

Plaintiff also argues that Dr. Schwartz's opinions were supported by the opinions of Dr. Fortuno-Ramirez and Dr. Georgiou. (Pl.'s Mem. at 20.) However, the ALJ determined that Dr. Fortuno-Ramirez's opinion was not supported by the treatment records. (R. 24.)  Further, Dr. Georgiou's opinion that Campbell had moderate limitations in the four broad areas of functioning does not support Dr. Schwartz's more extreme limitations. The ALJ thoroughly discussed Dr. Georgiou's opinion at step three and in making his RFC determination and gave it highly significant weight. (R. 19-20, 23.) Plaintiff does not identify what aspects of Dr. Schwartz's opinion he believes are supported by Dr. Georgiou or how those aspects are inconsistent with the ALJ's RFC determination limiting Campbell to the performance of simple, routine tasks with only occasional decision-making, changes in the work setting and interaction with supervisors and co-workers. (R. 21.)

Finally, Plaintiff argues that the ALJ failed to follow the Appeals Council's remand order because he did not reconsider the entire record. (Pl.'s Mem. at 20.) The Court disagrees. The ALJ's decision was consistent with the Appeals Council determination that Dr. Schwartz's 2014 and 2015 opinions were not supported by the record. (R. 114-15, 117.) Indeed, had the ALJ assigned

controlling, or even significant, weight to Dr. Schwartz's opinions without any new evidence to support them, that decision would have been inconsistent with the Appeals Council's findings.[8] *See* 20 C.F.R. § 404.977(b) (on remand from Appeals Council ALJ "may take any additional action that is not inconsistent with the Appeals Council's remand order").

For these reasons, the Court finds that Plaintiff has not identified any error warranting remand regarding the ALJ's treatment of Dr. Schwartz's opinions.

## II.   The ALJ's Weighing Of The Expert Medical Evidence

As a second basis for remand, Plaintiff argues that the ALJ failed to apply the correct legal standards for weighing the opinions of medical experts Dr. Fortuno-Ramirez and Dr. Vitolo. (Pl.'s Mem. at 20-23.) In particular, Plaintiff contends that the ALJ erred by failing to assign any weight to the opinion of Dr. Fortuno-Ramirez and failing to give good reasons for the weight assigned to the opinion of Dr. Vitolo. (R. 23.)

The Court finds that any error in failing to assign specific weight to the opinion of Dr. Fortuno-Ramirez is harmless. The ALJ found that Dr. Fortuno-Ramirez's opinion was not supported by the treatment records and explained his decision to give greatest weight to Dr. Vitolo's opinion. (R. 24.) Dr. Vitolo's opinion, which the ALJ adopted, specifically addressed Dr. Fortuno-Ramirez's interrogatory responses and explained his reasons for reaching a different

---

[8] The Court is mindful that this case presents an unusual procedural posture, where the ALJ rendered the decision currently before the Court following the Appeals Council's decision to vacate his prior award of benefits. While the Appeals Council's decision was not immediately reviewable, *see Iwachiw v. Massanari*, 125 F. App'x 330, 331 (2d Cir. 2005), Plaintiff does not directly challenge it here. Given the Appeals Council's decision and the record before the ALJ, it is difficult to see how the ALJ could have weighed Dr. Schwartz's opinions differently on remand. In any event, because it was not raised by either party, and the Court finds no legal error in the ALJ's decision for the reasons set forth above, the Court need not further address the Appeals Council's decision.

conclusion. (R. 682.) Thus, as with Dr. Schwartz, the ALJ's rationale can be inferred from his decision. *See Camille*, 652 F. App'x at 28 (despite ALJ's failure to assign specific weight to opinion, remand not necessary when ALJ's rational could be inferred from his decision).

As for Dr. Vitolo, Court finds that Plaintiff's argument is simply another way of arguing that that the ALJ erred in giving less weight to Dr. Schwartz's opinions. The Court notes that the "good reasons" requirement referenced by Plaintiff exists in the context of the treating physician rule. For the reasons set forth in Discussion Section I above, the Court finds that any error in weighing Dr. Schwartz's opinions was harmless.

### III.    Paragraph C Criteria

Finally, Plaintiff argues that the ALJ erred at step three by failing to offer meaningful analysis regarding the "paragraph C" criteria. (Pl.'s Mem. at 23-24.) To satisfy the requirements of Listing 12.04 or 12.06, a plaintiff must meet the criteria of paragraph A and either paragraph B or C of the Listing. Thus, a finding that Campbell satisfied the paragraph C criteria would result in a determination that he was disabled, regardless of the paragraph B analysis.

The "paragraph C" criteria are the same for Listings 12.04 and 12.06 and require a plaintiff to show: "(1) medical documentation of the disorder for a period of at least two years and (2) evidence of both (a) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of the mental disorder," as well as (b) "marginal adjustment, that is, the claimant has minimal capacity to adapt to changes in his environment or to demands that are not already part of his daily life." 20 C.F.R. Pt. 404 Subpt. P, App'x 1, §§ 12.04(C), 12.06(C); *see also id*. §§ 12.00(D) (outlining procedure for assessing treatment and psychosocial support), 12.00(G) (defining terms).

While cursory treatment of the "paragraph C" criteria may be a basis for remand in certain circumstances, "[a]n ALJ's unexplained conclusion [at step three] of the analysis may be upheld where other portions of the decision and other 'clearly credible evidence' demonstrate that the conclusion is supported by substantial evidence." *Ryan v. Astrue*, 5 F. Supp. 3d 493, 507 (S.D.N.Y. 2014) (citation omitted); *see also Schildwachter v. Berryhill*, No. 17-CV-07277, 2019 WL 1116256, at *7 (S.D.N.Y. Feb. 8, 2019) (finding harmless error where ALJ failed to explicitly assess paragraph C criteria in order to determine plaintiff's listing eligibility, in light of other portions of ALJ's decision and clearly credible evidence indicating that plaintiff could not meet required criteria).

Here, the Court finds that any error by the ALJ in failing to further address the "paragraph C" criteria was harmless in light of credible evidence that Campbell could not meet the required criteria, including the requirement to demonstrate "marginal adjustment." The applicable regulations state that marginal adjustment is demonstrated where there is evidence that changes or increased demands have led to exacerbation of symptoms and signs, and to deterioration in functioning. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(G)(2)(c). Examples of such deterioration include the inability to function outside of your home or a more restrictive setting, without substantial psychosocial support; the necessity for a significant change in medication or other treatment; and episodes of deterioration that require hospitalization. *Id*.

Courts in this Circuit routinely have found that no reasonable fact finder could conclude that a plaintiff could meet this standard when, *inter alia*, the plaintiff functioned mostly independently, including by shopping, going online, traveling independently and managing money, and was observed to have goal-directed thoughts. *See*, *e.g.*, *Ivey v. Comm'r of Soc. Sec.*, No. 19-CV-00657 (EAW), 2020 WL 5046261, at **9-10 (W.D.N.Y. Aug. 27, 2020); *Jeffrey v.*

*Berryhill*, No. 18-CV-00115 (LEK), 2019 WL 2210593, at **7-8 (N.D.N.Y. May 22, 2019); *Mitchell v. Berryhill*, No. 16-CV-06588, 2018 WL 3300683, at *18 (S.D.N.Y. Feb. 2, 2018), *report and recommendation adopted sub nom.*, *Mitchell v. Colvin*, 2018 WL 1568972 (S.D.N.Y. Mar. 30, 2018). Here, the record demonstrates that Campbell could function independently in activities of daily living, including shopping, cleaning, cooking and laundry; that he used public transportation independently; used email; could manage money; had goal-oriented thoughts; was interested in going back to school; and had worked various jobs off the books. (R. 48-51, 630, 661.) Accordingly, I find that remand is not warranted based on the ALJ's step three analysis.

### CONCLUSION

For the reasons set forth above, the Commissioner's motion is GRANTED and Plaintiff's motion is DENIED.

DATED:   September 22, 2020
         New York, New York

_____
**STEWART D. AARON**
**United States Magistrate Judge**

23